Victor J. Sandoval (SBN 344461)
**ALMEIDA LAW GROUP LLC**
3415 S. Sepulveda Blvd. Suite 1121
Los Angeles, California 90034
(562)534-5907
victor@almeidalawgroup.com

*Counsel for Plaintiff & Proposed Classes*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CAMERON DECKER, *on behalf of himself and all others similarly situated,*<br><br>Plaintiff,<br><br>vs.<br><br>MONKEY TAPS, LLC,<br><br>Defendant. | Case No. 2:26-cv-4058<br><br>**CLASS ACTION COMPLAINT**<br><br>1. VIOLATION OF THE FLORIDA SECURE COMMUNICATIONS ACT, FLA. STAT. §§ 934.03, *et seq.*<br>2. VIOLATION OF THE ELECTRONIC COMMUNICATIONS PRIVACY ACT, 18 U.S.C. §§ 2511, *et seq.*<br>3. VIOLATION OF CALIFORNIA INVASION OF PRIVACY ACT, CAL. PENAL CODE § 631<br>4. VIOLATION OF CALIFORNIA INVASION OF PRIVACY ACT, CAL. PENAL CODE § 632<br>5. INTRUSION UPON SECLUSION<br>6. INVASION OF PRIVACY<br>7. BREACH OF CONTRACT<br>8. BREACH OF IMPLIED CONTRACT<br>9. UNJUST ENRICHMENT<br><br>**DEMAND FOR JURY TRIAL** |

-1-

**CLASS ACTION COMPLAINT**

Plaintiff Cameron Decker brings this class action lawsuit against Monkey Taps, LLC ("Monkey Taps" or "Defendant"), individually and on behalf of all others similarly situated, and alleges the following based upon personal knowledge as to himself and his actions, knowledge and experiences, and upon information and good faith belief as to all other matters.

## INTRODUCTION

1.      This class action lawsuit challenges Monkey Taps' practice of secretly intercepting and transmitting the private communications and personal data of the users of its mobile applications to third parties—including Meta Platforms, Inc. ("Meta" or "Facebook") and TikTok Inc./ByteDance Ltd. ("TikTok") (together, the "Tracking Technologies")—without the knowledge or consent of its users.

2.      Monkey Taps is a mobile application developer headquartered in Miami, Florida that publishes applications for personal growth and development including tools for motivational quotes, daily affirmations, vocabulary building, mood tracking, and more.

3.      Monkey Taps publishes several applications (collectively, "the Apps" or individually, an "App") on both Apple's iOS App Store and Google's Play Store, namely:

    a. **Motivation – Daily Quotes** (the "Motivation App"), which has over 5 million Android downloads;[1]

    b. **I Am – Daily Affirmations** (the "I Am App"), which has over 10 million Android downloads;[2]

---

[1]*Motivation – Daily Quotes*, Google Play Store, https://play.google.com/store/apps/details?id=com.hrd.motivation&hl=en_US (last visited March 4, 2026).

[2]*I Am – Daily Affirmations*, Google Play Store, https://play.google.com/store/apps/details?id=com.hrd.iam&hl=en_US (last visited March 4, 2026).

**CLASS ACTION COMPLAINT**

c. **Vocabulary – Learn Words Daily** (the "Vocabulary App"), which has over 5 million Android downloads;[3]

d. **Daily Random Facts** (the "Daily Facts App"), which has over 500,000 Android downloads;[4]

e. **Loving Kindness** (the "Loving Kindness App"), which has over 50,000 Android downloads;[5]

f. **Moodlight / Mood AI – Daily Journal** (the "Moodlight App"), which has over 100,000 Android downloads;[6]

g. **Bible Widgets** (the "Bible App"), which has over 100,000 Android downloads.[7]

4. Combined, the Apps have been downloaded approximately 50 million times.

5. Unbeknownst to users, Monkey Taps embedded third-party software development kits ("SDKs") within the Apps—specifically, the Facebook SDK and the TikTok Business SDK—that secretly intercept and transmit users' private communications, app usage data, and device identifiers to Meta and TikTok for advertising and analytics purposes.

---

[3] *Vocabulary – Learn Words Daily*, Google Play Store, https://play.google.com/store/apps/details?id=com.hrd.vocabulary&hl=en_US (last visited March 4, 2026).

[4] *Daily Random Facts*, Google Play Store, https://play.google.com/store/apps/details?id=com.hrd.facts&hl=en_US (last visited March 4, 2026).

[5] *Loving Kindness*, Google Play Store, https://play.google.com/store/apps/details?id=com.hrd.lk&hl=en_US (last visited March 4, 2026).

[6] *Moodlight–Daily Mood Tracker*, Google Play Store, https://play.google.com/store/apps/details?id=app.monkeytaps.moodlight&hl=en_US (last visited March 4, 2026).

[7] *Bible Widgets*, Google Play Store, https://play.google.com/store/apps/details?id=com.hrd.biblewidgets&hl=en_US (last visited March 4, 2026).

**CLASS ACTION COMPLAINT**

6.     Users of the Apps reasonably expect that their personal interactions provided to Monkey Taps via these applications—including their emotional states, mental wellness activities, personal affirmations, vocabulary learning patterns, religious beliefs, and daily habits—will remain private and confidential.

7.     The information transmitted by the App is inherently private and personal, falling within categories including religion, gender identity, mental health data, and educational achievement level that courts, legislatures, and regulatory bodies have consistently recognized as among the most sensitive forms of personal information available.

8.     Taken together, the data collected across Monkey Taps' suite of Apps includes emotional vulnerabilities, spiritual practices, intellectual pursuits, daily routines, and psychological well-being.

9.     The nonconsensual disclosure or mishandling of this data can cause irreversible harm—undermining users' autonomy, dignity, and equality, and chilling their willingness to seek mental health support, practice their faith, or engage in self-improvement.[8]

10.    Because such data touches on the most personal aspects of human life, Defendant's obligation to safeguard it was correspondingly grave.

11.    Not only have legislators recognized the sensitivity and need for confidentiality of this data, but Monkey Taps itself proclaims that it does not transmit its users' data to Facebook or TikTok for advertising purposes.

12.    In fact, in the privacy policy it displays to users in each of the Apps (the "Privacy Policy"), Monkey Taps "guarantee[s] the security of the user's personal

---

[8] Brennan Ctr. for Justice, *Closing the Data Broker Loophole* 7–9 (2023), https://www.brennancenter.org/our-work/research-reports/closing-data-broker-loophole (warning that "the integration of new AI tools will make it easier to extract, re-identify, link, infer, and act on sensitive information about people's identities, locations, habits, and desires" and urging legislative action to curb the unregulated sale of behavioral data) (internal quotation marks omitted).

**CLASS ACTION COMPLAINT**

data and prevent[ion of] its alteration, loss, unauthorized processing, or access" and that "the information [provided to Monkey Taps via the Apps] cannot be intercepted."[9]

13. The Privacy Policy further misleads users into believing that "[a]ll user information will be treated with absolute confidentiality" and that Monkey Taps "will only transfer your personal data to the companies strictly necessary to comply with the contracting of products and/or services[.]"[10]

14. These assurances, along with all other similar statements in the Privacy Policy, are false and misleading because Defendant surreptitiously transmits user communications to third parties through the Tracking Technologies for marketing purposes.

15. Defendant's secret interception and transmission of users' private communications and personal information to Meta and TikTok violates the Electronic Communications Privacy Act, 18 U.S.C. §§ 2511, 2520 ("ECPA"); the Florida Security of Communications Act, Fla. Stat. §§ 934, *et seq.* ("Florida Wiretap Act"); the California Invasion of Privacy Act, Cal. Penal Code §§ 630, *et seq.* ("CIPA"); and constitutes an invasion of privacy, breach of contract, breach of implied contract, and unjust enrichment.

## PARTIES

16. Plaintiff Cameron Decker is a citizen who, at all times relevant to this litigation, has resided (and continues to reside) in Encino, California, which is in Los Angeles County.

17. Defendant Monkey Taps, LLC is a Florida limited liability company headquartered at 1000 Brickell Avenue, Ste 715 in Miami, Florida, 33131.

---

[9] Monkey Taps, LLC, *Privacy Policy*, "To Whom Do We Provide Your Personal Data?," https://monkeytaps.net/privacy  (last visited March 4, 2026).

[10] *Id.*

**CLASS ACTION COMPLAINT**

## JURISDICTION AND VENUE

18. This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2) because (a) this is a class action lawsuit in which the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs; (b) there are more than 100 members of the proposed class; and (c) at least one member of the proposed class is a citizen of a state different from the Defendant.

19. This Court has personal jurisdiction over Monkey Taps because it has purposefully availed itself of the privilege of conducting activities in California by publishing the Apps on Apple's iOS App Store and Google's Play Store, making them available for download to California residents, including Plaintiff, and by directing its business activities toward California users.

20. Defendant's tortious conduct, such as embedding the Facebook and TikTok SDKs within the Apps to intercept the communications of California users, caused injury to Plaintiff in California.

21. Defendant's contacts with the forum are such that it should reasonably anticipate being haled into court in this District.

22. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this District, including Plaintiff's download and use of the Apps, the interception and transmission of Plaintiff's private communications and personal data through the embedded SDKs, and the resulting injuries sustained by Plaintiff.

## FACTUAL ALLEGATIONS

### A. *Monkey Taps' Apps and Their Users.*

23. Monkey Taps develops and publishes the Apps, which are designed to help users with personal growth, self-improvement, and mental wellness. Specifically,

- The Motivation App provides daily motivational quotes;

CLASS ACTION COMPLAINT

- The I Am App delivers daily affirmations for positive thinking;

- The Vocabulary App helps users learn new words;

- The Daily Facts App presents interesting facts;

- The Loving Kindness App guides users through loving-kindness meditation practices;

- The Moodlight App provides mood tracking and journaling features powered by artificial intelligence; and

- The Bible Widget App provides daily Bible readings, reading plans, and suggested verses.

24. The Apps are available for free download on both Apple's iOS App Store and Google's Play Store, with revenue generated through in-app purchases, premium subscriptions, and advertising.

25. Users of the Apps entrust Monkey Taps with sensitive personal information including, but certainly not limited to, their emotional states, mental wellness activities, personal affirmations, vocabulary learning patterns, religious beliefs, and daily habits.

26. The information transmitted by the App is inherently private and personal, falling within categories including religion, gender identity, mental health data, and educational achievement level that courts, legislatures, and regulatory bodies have consistently recognized as among the most sensitive forms of personal information available.[11]

27. For example, users who record their emotional states and other mental health information in the Moodlight App, the I Am App, the Loving Kindness App, and the Motivation App disclose intimate details about their psychological

---

[11] *See* Danielle Keats Citron, *A New Compact for Sexual Privacy*, 62 WM. & MARY L. REV. 1763, 1769 (2021) (noting that "[i]ntimate data reveals people's physical and emotional vulnerabilities, which firms exploit to their advantage. When intimate data is leaked or disclosed to hackers and criminals, individuals have an increased risk of reputational ruin, blackmail, and extortion.").

-7-

**CLASS ACTION COMPLAINT**

condition—information that, if exposed, could subject them to stigma, discrimination, or exploitation.[12]

28. The Federal Trade Commission has recognized the acute sensitivity of mental health app data, taking enforcement action against companies that shared such data with third-party advertising platforms without meaningful user consent.[13]

29. The religious and spiritual data collected by the I Am App, Bible Widget App, and the Loving Kindness App is particularly sensitive. Religious belief is explicitly protected under the California Consumer Privacy Act (CCPA), which designates "religious or philosophical beliefs" as "sensitive personal information."[14]

30. Taken together, the data collected across Monkey Taps' suite of Apps includes emotional vulnerabilities, spiritual practices, intellectual pursuits, daily routines, and psychological well-being. The Federal Trade Commission has recognized that companies holding such sensitive data bear a heightened obligation to protect it.[15]

---

[12] Leonardo Horn Iwaya, *et al.*, *On the Privacy of Mental Health Apps: An Empirical Investigation and Its Implications for App Development*, 28 EMPIRICAL SOFTWARE ENG'G, no. 1, 2023, at 1, 3–4 (finding that the "stigma around mental illnesses…increases the potentially negative impacts on users in case of privacy violations" and that "the mere link of users to a given app can reveal that they might be having some psychological problems (e.g., anxiety, depression, or other mental health conditions), which may make mental health apps users feel more vulnerable and fragile").

[13] *See In re BetterHelp, Inc.,* No. C-4796 (F.T.C. Mar. 2, 2023) (consent order) (banning online counseling service from sharing consumers' sensitive mental health information—including depression and suicidal-ideation disclosures—with Facebook and other advertising platforms); *see also* Press Release, Fed. Trade Comm'n, FTC to Ban BetterHelp from Revealing Consumers' Data, Including Sensitive Mental Health Information, to Facebook and Others for Targeted Advertising (Mar. 2, 2023).

[14] *See* Cal. Civ. Code § 1798.140(ae)(1)(D).

[15] *Location, Health, and Other Sensitive Information: FTC Committed to Fully*

-8-

**CLASS ACTION COMPLAINT**

31.    The nonconsensual disclosure or mishandling of this data can cause irreversible harm—undermining users' autonomy, dignity, and equality, and chilling their willingness to seek mental health support, practice their faith, or engage in self-improvement.[16]

**B.    Defendant's Secret Deployment of Third-Party Tracking SDKs.**

   *i.    Background on the Facebook SDK*

32.    The Facebook iOS SDK is a software library maintained by Meta that app developers embed directly into the source code of their mobile applications.[17] Its primary application is to transmit user data to Facebook's servers, including through Facebook's Graph API endpoint (ep1.facebook.com).[18]

33.    Meta describes the SDK as a toolkit that helps developers "understand how people use the app, run optimized marketing campaigns and enable Facebook login and social sharing."[19]

---

*Enforcing the Law Against Illegal Use and Sharing of Highly Sensitive Data* (July 11, 2022), https://www.presidency.ucsb.edu/documents/white-house-press-release-location-health-and-other-sensitive-information-ftc-committed   (affirming the Commission's commitment to "using the full scope of its legal authorities to protect consumers' privacy" against the illegal exploitation of health and other sensitive data).

[16] Danielle Keats Citron & Daniel J. Solove, Privacy Harms, 102 B.U. L. Rev. (2022),      https://www.bu.edu/bulawreview/files/2022/04/CITRON-SOLOVE.pdf (privacy violations produce emotional distress and chilling effects on behavior).

[17] Meta for Developers, *Facebook SDK for iOS*, https://perma.cc/5W3D-4QQ5 (last visited   March   4,   2026);   Facebook,   *facebook-ios-sdk*,   GitHub, https://perma.cc/Y4YS-2W4Q.

[18] The Facebook iOS SDK is a software library developed by Meta Platforms, Inc. that enables mobile application developers to integrate Facebook's advertising and analytics services into their applications. *See* Meta for Developers, Facebook SDK for iOS, https://perma.cc/5W3D-4QQ5  (last visited March 4, 2026).

[19] Meta Blueprint, *Get Started With the Facebook SDK and App Events for Android and iOS*, https://perma.cc/7G4U-D66Q.

-9-

**CLASS ACTION COMPLAINT**

34. In practice, the SDK collects data about user activity inside the host app and transmits it to Meta's servers, where it feeds into Meta's advertising platform.

35. The SDK is the mobile equivalent of the Facebook Pixel (used on websites); both are part of Meta's "Facebook Business Tools" suite.[20]

36. By default, the SDK begins collecting and transmitting data the moment the host app launches, with no action required from the user. The default auto-logging setting (*FacebookAutoLogAppEventsEnabled*) is *true* unless the developer explicitly disables it.[21]

37. A 2018 Privacy International investigation found that 61% of tested apps automatically transmitted data to Facebook the instant a user opened the app—regardless of whether the user had a Facebook account.[22]

38. The Facebook SDK automatically collects and transmits the following categories of data to Meta's servers:

    a.   **Device identifiers:** The SDK collects the Apple Identifier for Advertisers ("IDFA"), a unique persistent identifier assigned by Apple to each iOS device, and transmits it to Facebook as the "advertiser_id." On Android and Google devices, the SDK collects the Google Advertising ID (GAID) or Android Advertising (AAID), which are personal identifiers assigned by Google to individual device owners. The SDK also collects the Identifier for Vendors ("IDFV"), which identifies the device on a per-vendor basis.[23]

---

[20]Meta Platforms, Inc., *Facebook Business Tools Terms*, https://perma.cc/XYP3-2TKE (last visited March 4, 2026).

[21]RudderStack, *Facebook App Events Destination*, https://perma.cc/RCH4-63B7 (last visited March 4, 2026) (documenting the SDK's consent configuration settings).

[22]Privacy International, *How Apps on Android Share Data with Facebook – Report* (Dec. 29, 2018), https://perma.cc/K4T2-GKCG.

[23]Meta for Developers, *App Events API Reference*, https://perma.cc/8CEW-K984 (last visited March 4, 2026); *see also* Twilio Segment, *Facebook App Events Destination*, https://perma.cc/XHY8-MCMV (last visited March 4, 2026) (noting that "[t]he integration . . . requires that the IDFA is working within your app, which

-10-

**CLASS ACTION COMPLAINT**

b. **App Events:** The SDK records and transmits "App Events"—structured data describing specific user actions within the application—to Meta's servers via Facebook's Graph API endpoint. These events include application launches ("app_install" and "activated_app"), in-app purchases, content views, searches, adds-to-cart, and custom events defined by the developer.[24]

c. **Device fingerprinting data:** The SDK collects and transmits detailed device information that collectively forms a unique device fingerprint, including the precise device model (e.g., iPhone17), operating system version, locale and language settings, timezone, screen resolution, and the full user agent string.

d. **IP address:** The SDK transmits the user's IP address with each server request, which reveals the user's approximate geographic location and serves as an additional data point for identity resolution.

e. **Advertising tracking status:** The SDK transmits a flag labeled "advertiser_tracking_enabled" that indicates whether the data is being used for advertising purposes.

39. Once user data is received by Meta's servers through the Facebook SDK, Meta incorporates that data into its advertising ecosystem, where it is made available to third-party advertisers in several ways:

a. **Custom Audiences:** Advertisers can upload lists of customers or targets (using identifiers such as email addresses, phone numbers, or device IDs), and Meta matches those identifiers against its database—which includes data collected through the Facebook SDK—to serve targeted ads to matching users across Facebook, Instagram, and the Meta Audience Network.[25]

b. **Lookalike Audiences:** Meta uses data collected through the SDK to identify users who share behavioral and demographic characteristics with an advertiser's existing customers, enabling advertisers to target new users who are statistically likely to be interested in their products—based in part on in-app behavioral data collected from entirely unrelated applications.

c. **Ad optimization and targeting:** App Events transmitted through the SDK feed directly into Meta's ad delivery algorithm. Advertisers

---

involves adding the AdSupport and App Tracking Transparency frameworks").

[24]Meta for Developers, *App Events: Getting Started*, https://perma.cc/W57N-E73D (last visited March 4, 2026).

[25]Meta for Developers, *Custom Audiences*, https://perma.cc/3WGX-U922 (last visited March 4, 2026).

-11-

**CLASS ACTION COMPLAINT**

can optimize their campaigns for specific in-app actions (e.g., purchases, registrations, content views), and Meta uses the SDK data to determine which users are most likely to take those actions—drawing on behavioral data collected from across Meta's entire network of SDK-integrated applications.[26]

    d.    **Attribution and measurement:** Meta provides advertisers with attribution data—including user-level attribution for both iOS and Android devices through its Advanced Mobile Measurement ("AMM") program—that links ad impressions and clicks to subsequent in-app actions, enabling advertisers to measure the effectiveness of their campaigns at the individual user level.[27]

40.    Beyond automatic events, developers can configure the SDK to log virtually any user interaction. Meta defines 17 "standard events" that its ad algorithm is trained to optimize for: Purchase, Add to Cart, Add to Wishlist, Initiate Checkout, Add Payment Info, Complete Registration, Lead, Contact, Search, View Content, Customize Product, Donate, Find Location, Schedule, Start Trial, Subscribe, and Submit Application.[28]

41.    Each can carry parameters such as monetary value, currency, content name, and category. Developers can also define up to 1,000 custom event names—each carrying unlimited parameters (25 active at a time)—to track any app-specific action.[29]

---

[26]Meta for Developers, *App Event Optimization*, https://perma.cc/R6XN-AAH9 (last visited March 4, 2026).

[27]Singular, *Facebook (Meta) Ads Attribution Integration*, Singular Help Center, https://support.singular.net/hc/en-us/articles/115003252706 (last visited March 4, 2026).

[28]Meta for Developers, *Meta Pixel Reference*, https://perma.cc/QR3P-4L63 (last visited March 4, 2026); LeadsBridge, *Facebook Standard Events: The Up-to-date Guide*, https://perma.cc/5H2V-VDC3.

[29]Jon Loomer Digital, *Differences Between Custom Events and Custom Conversions*, https://www.jonloomer.com/differences-between-custom-events-and-custom-conversions/ (last visited March 4, 2026).

-12-

**CLASS ACTION COMPLAINT**

42.     Alongside event data, the SDK transmits persistent device identifiers: the Apple IDFA (with advertiser ID collection enabled by default since SDK v13.0.0[30]), the IDFV, the Google Advertising ID (GAID) on Android, the user's IP address, an *advertiser_tracking_enabled* flag, and a device fingerprint comprising device model, OS version, screen resolution, locale, time zone, and user agent string.[31]

43.     Once received, Meta incorporates this data into its advertising ecosystem. Advertisers use it to build Custom Audiences and Lookalike Audiences, optimize campaigns for specific in-app actions ("App Event Optimization"), and obtain user-level attribution data through Meta's Advanced Mobile Measurement ("AMM") program.[32]

44.     In short, the Facebook SDK operates as a pipeline that extracts detailed user data from third-party applications and feeds it into Meta's advertising infrastructure, where it is used to build comprehensive user profiles, serve targeted advertisements, and measure advertising effectiveness—all without the knowledge or informed consent of the application's users.

---

[30]*See* Top Analytics Tools, *Facebook App Events for Android: Setup Guide* (Feb. 24, 2025), https://perma.cc/V6FZ-GCR2.

[31]Twilio Segment, *Facebook App Events Destination*, https://perma.cc/XHY8-MCMV (last visited March 4, 2026).

[32]Meta for Developers, *Custom Audiences*, https://perma.cc/3WGX-U922; *App Event Optimization*, https://perma.cc/AF5Z-3FNE; Singular, *Facebook (Meta) Ads Attribution Integration*, https://support.singular.net/hc/en-us/articles/115003252706 (all last visited March 4, 2026).

-13-

**CLASS ACTION COMPLAINT**

*ii.    Background on the TikTok SDK*

45.    The TikTok Business iOS SDK is a software library developed by TikTok that enables mobile application developers to integrate TikTok's advertising and analytics services into their applications. [33]

46.    The SDK collects identifier categories including IDFA and IDFV on iOS and GAID on Android, and IP address. It also captures App Tracking Transparency ("ATT") authorization status and device attributes (model, OS version, user agent, screen resolution, language, time zone).

47.    Captured data is batched to TikTok's analytics endpoint (analytics.us.tiktok.com). TikTok's data terms describe what flows through the SDK as "Event Data," including "technical information (like IP address, country, or browser type) and user actions on your site or app."[34]

48.    These SDKs operate as embedded code within the Apps that automatically intercept and redirect users' private communications and personal data to Meta's and TikTok's servers each time a user opens or interacts with the Apps.

49.    The TikTok SDK intercepts and transmits, at a minimum, the following categories of user data:

a.    **The Apple Identifier for Advertisers ("IDFA")**—a unique, persistent identifier assigned to each Apple device that enables cross-app and cross-website tracking of individual users;[35]

b.    **The Identifier for Vendors ("IDFV")**—a unique identifier assigned to each app vendor on a device;

---

[33] *TikTok SDK for iOS*, https://perma.cc/SZ99-JJ35 (last visited March 4, 2026).

[34] Usercentrics, *TikTok Privacy Policy: Data Sharing Terms Requirements for Businesses*, https://perma.cc/6FXK-ACXH (last visited March 4, 2026).

[35] *See* Apple Inc., *ASIdentifierManager*, Apple Developer Documentation, https://perma.cc/7738-LD6D (last visited March 4, 2026) (describing the IDFA as a unique, resettable identifier used for advertising purposes).

-14-

**CLASS ACTION COMPLAINT**

c. **The user's IP address**—which reveals the user's approximate geographic location and can be used to identify the user;

d. **Detailed device information**, including the precise device model (e.g., iPhone17.3), operating system version, locale, time zone, screen resolution, and full user agent strings—which collectively constitute a unique device fingerprint;

e. **App usage events and behavioral data**, including app launch events, page views, click tracking data, session activity metrics, and purchase/checkout events; and

f. **SDK configuration and tracking metadata**, including advertising tracking enablement status, ATT authorization status, SDK version information, and session timestamps.

50.     TikTok makes SDK data available to advertisers through TikTok Ads Manager. Advertisers can create "App Activity Custom Audiences" from SDK events or upload device identifier lists (IDFAs/GAIDs) to build targeting segments.[36]

51.     The SDK powers three campaign optimization tiers: Mobile App Install ("MAI"), App Event Optimization ("AEO"), and Value-Based Optimization ("VBO")—each drawing on behavioral data from across all SDK-integrated apps. TikTok also supports retargeting (serving ads based on in-app behavior in unrelated applications) and provides conversion attribution with customizable attribution windows.[37]

**C.     Facebook and TikTok SDKs Intercept User Communications in Each of Defendant's Apps.**

52.     In each of Defendant's Apps, the TikTok and Facebook SDKs operate to capture users' unique identifiers, including the IDFA, along with their sensitive communications with Defendant through the App.

---

[36]Lebesgue, *Creating a Custom Audience for TikTok Ads*, https://perma.cc/N88M-CLG9 (last visited March 4, 2026).

[37]TikTok Ads Manager, *Get Started with Events API*, https://perma.cc/J92M-XMEA (last visited March 4, 2026).

-15-

```
                                        HTTP/1.1   POST analytics.us.tiktok.com   REQUEST ^

METHOD: POST +

URL
+ https://analytics.us.tiktok.com/api/v1/app_sdk/config

HEADERS -
+ Accept:            */*
+ Accept-Encoding:   gzip, deflate, br
+ Accept-Language:   en-US,en;q=0.9
+ Connection:        keep-alive
+ Content-Encoding:  gzip
+ Content-Length:    569
+ Content-Type:      application/json
+ Host:              analytics.us.tiktok.com
+ User-Agent:        IAM/20260109405 CFNetwork/3826.600.41 Darwin/24.6.0


                                    929 bytes   JSON v   REQUEST BODY ^

1  {
2    "app": {
3      "build": "20260109405",
4      "id": "874656917",
5      "tiktok_app_id": "71462189559224717313",
6      "namespace": "com.MonkeyTaps.IAM",
7      "version": "6.18.0",
8      "app_session_id": "F32E8073-6790-48BF-8C2B-1A171A389810",
9      "name": "IAM"
10   },
11   "device": {
12     "locale": "en-US\/US",
13     "idfa": "1CDA3BA1-EA76-4FB2-BF20-293FDDE2E5C9",
14     "platform": "ios",
15     "idfv": "3C9F6635-44D9-4FBA-B3D3-FB468BA34F41",
16     "model": "iPhone17,3",
17     "version": "18.6.2",
18     "att_status": "AUTHORIZED",
19     "ip": "100.102.224.180",
20     "user_agent": "Mozilla\/5.0 (iPhone; CPU iPhone OS 18_6_2 like Mac OS X)
       AppleWebKit\/605.1.15 (KHTML, like Gecko) Mobile\/15E148 IAM\/6.18.0 iPhone17,
       3 iOS\/18.6.2 CFNetwork\/1.0 Darwin\/24.6.0 Resolution\/393*852"
21   },
22   "debug": false,
23   "library": {
24     "name": "tiktok\/tiktok-business-ios-sdk",
25     "version": "1.5.1",
26     "smart_sdk_client_flag": true
27   }
28 }
```

53.     The TikTok SDK is active in Defendant's Apps and configured to capture specific user identifiers (the "IDFA" parameter) along with a user's clicks throughout the pages. Specifically, the TikTok SDK transmits each user's IDFA—a

-16-

**CLASS ACTION COMPLAINT**

persistent, unique identifier that enables TikTok to track that individual across applications and websites—alongside granular click and interaction data that reveals the substance of the user's communications with the App.

54. Each time a user taps a button, selects an option, or navigates to a new screen within any of the Apps, the TikTok SDK records the specific element interacted with, the page on which the interaction occurred, and the timestamp of the interaction, and transmits this data to TikTok's analytics servers.

55. In the context of Defendant's Apps, these clicks are not mere navigational inputs; they are the very means by which users communicate their most private thoughts, beliefs, and emotional states to the App.

```
19          ],
20          "enable_app_launch_track": true,
21          "enable_click_track": true,
22          "enable_page_show_track": true,
23          "enable_pay_show_track": true,
24          "enable_sdk": false,
25          "enable_sync_get_touch_position": true,
26          "enable_webview_request_track": false,
27          "page_detail_upload_deep_count": 12,
28          "report_frequency_control": 1,
29 v        "sensig_filtering_regex_list": [
30            "([a-zA-Z0-9._-]+@[a-zA-Z0-9._-]+\\.[a-zA-Z0-9._-]+)|(\\+?0?86-?)?1
        [3-9]\\d{9}|(\\+\\d{1,2}\\s?)?\\(?\\d{3}\\)?[\\s.-]?\\d{3}[\\s.-]?\\d{4}"
```

56. The click-tracking feature of the TikTok SDK captures more than a user's mere mouse movements and actions but transmits the substantive content of users' communications with the Apps.

57. Each of the Apps transmit sensitive data to the SDK:

a. When a user saves or "favorites" a particular motivational quote in the Motivation App, thereby revealing the specific emotional or psychological theme that resonated with the user;

b. When a user selects a daily affirmation in the I Am App disclosing the user's personal aspirations, insecurities, or areas of self-improvement;

c. When a user navigates to specific vocabulary lessons or completes quiz exercises in the Vocabulary App, revealing the user's educational level and intellectual interests;

-17-

**CLASS ACTION COMPLAINT**

d.  When a user records a mood entry or journal reflection in the Moodlight App, exposing the user's emotional and psychological state;

e.  When a user engages with Bible verses, reading plans, or suggested scripture in the Bible Widget App, disclosing the user's religious practices and spiritual beliefs;

f.  When a user initiates a loving-kindness meditation session or selects a meditation focus in the Loving Kindness App, revealing the user's mental health practices and emotional needs; and

g.  When a user selects an item to purchase or completes an in-app purchase; or when a user otherwise affirmatively interacts with any of the Apps.

58.    In each instance, the TikTok SDK intercepts and transmits not only the fact of the user's interaction, but the specific content of the communication—the quote that was saved, the affirmation that was chosen, the mood that was recorded, the scripture that was read—alongside the user's unique device identifiers, enabling TikTok to associate these intimate disclosures with an identifiable individual.

59.    Because clicks and page views convey the user's choices and interactions within the Apps, clicks within the Apps constitute content of communication, especially when, as is often the case in the Apps, users are asked to click specific options on a page that correspond to such highly sensitive information as religious beliefs, gender identity, employment status, relationship status, and more.

60.    For example, when a user in the I Am App taps a button to select "Christianity," "Islam," "Buddhism," or another religious affiliation, the click itself is the communication of the user's religious belief. Similarly, when a user selects a gender identity, taps a mood rating, or chooses an affirmation category reflecting a particular emotional vulnerability, the click is the substantive expression of that private information.

61.    The SDKs capture not only the fact that a click occurred but the specific element that was clicked, the page context in which it occurred, and the user's unique identifiers—rendering each click a fully identifiable, content-rich communication that is simultaneously intercepted and diverted to third-party advertising companies.

-18-

**CLASS ACTION COMPLAINT**

62.    By integrating the SDKs into the Apps and programming them to collect such data, Defendant aids and abets the interception of these communications without the user's consent.

63.    As the screenshot above shows, the TikTok SDK also tracks a user's page views and payment status. Because each page in each of the Apps represents highly specific information that relates to a user's saved affirmations, vocabulary quiz results, and other potentially sensitive data, and because data from these unique pages is transmitted simultaneously alongside the user's IDFA and other unique identifiers, page views in the Apps are specific user-linked communications to Defendant.

64.    For instance, a page view in the I Am App may reveal that a user navigated to affirmation categories relating to anxiety, self-worth, body image, or grief—each disclosing an intimate dimension of the user's psychological state.

65.    A page view in the Moodlight App may reveal that a user accessed a journal entry screen or mood-tracking feature at a particular time and on a particular date, disclosing patterns in the user's emotional well-being.

66.    A page view in the Bible Widget App may reveal that a user accessed a specific reading plan, such as one focused on overcoming addiction, coping with loss, or strengthening faith during hardship—exposing the user's religious beliefs and personal struggles.

67.    The SDK's simultaneous capture of the user's payment status further reveals whether the user has purchased a premium subscription, providing TikTok with additional data regarding the user's financial behavior and degree of engagement with these sensitive personal applications.

68.    As seen in the screenshots below, the Apps ask for sensitive information of users including their religious affiliation, employment status, gender identity, relationship status, and more. Users transmit their answers to these sensitive questions by clicking specific points on the page. The page name, identifier, and user

click location (which here constitutes the contents of a communication) are simultaneously intercepted by the Tracking Technologies.

69. The screenshots below illustrate the initial screen flow in the I Am App and the sensitive questions which Plaintiff and other users of the I Am App would have encountered after downloading. Each App contains similar sensitive questions in its initial screen flow.[38]

Skip

**Get affirmations that fit your relationship status**

Choose the option that describes it the best

Single and open to connection ○

Happily single ○

In a happy relationship ○

Going through a breakup ○

It's complicated ○

Not interested in this topic ○

Skip

**Which of these best describes your beliefs?**

This information will be used to personalize your affirmations

Christianity ○

Judaism ○

Islam ○

Hinduism ○

Buddhism ○

Other ○

---

[38] *See Motivation App*, https://motivation.app/ (collecting information about user's religious affiliation and personal habits) (last visited April 14, 2025); *Bible Widgits*, https://biblewidgets.app/ (collecting religious affiliation data) (last visited April 14, 2025); *Vocabulary* App, https://thevocabulary.app/ https://biblewidgets.app/ (collecting users' vocabulary knowledge and educational goals) (last visited April 14, 2025); *Loving Kindness*, https://lovingkindness.app/, (recording users self-reported mindset) (last visited April 14, 2025).

**CLASS ACTION COMPLAINT**

70. The Facebook SDK is also present in each of Defendant's Apps and is configured to capture an individual user's identity along with his or her downloading, onboarding, and purchase of any of Defendant's Apps.

71. The Facebook SDK begins transmitting data to Meta's servers from the moment a user first opens any of the Apps, before the user has had an opportunity to engage with the App's content or review its privacy policy.

72. During the onboarding process, in which an App solicits users' responses to sensitive personal questions regarding their religious affiliation, gender identity, relationship status, and employment status, the Facebook SDK captures and transmits the user's device identifiers (including the IDFA) alongside app event data that reflects the user's progression through these intake screens, thereby linking the

-21-

CLASS ACTION COMPLAINT

user's identity to the fact that the user has downloaded and begun using a personal growth, mental health, or religious application.

73. In each App, the Facebook SDK is configured to capture a user's individually identifiable "advertiser ID," which is equivalent to the "IDFA" described *supra*.

74. The Facebook SDK in each of Defendant's Apps is configured to capture whether a user begins or ends a trial, when a user opens and closes each app, and whether a user makes a purchase in the App, and which page a user views in any of the Apps, among other customized event parameters designed to capture user behavioral data. Each of these events constitutes a substantive communication between the user and the App that is simultaneously intercepted by the Facebook SDK.

75. For example, when a user begins or ends a free trial, the Facebook SDK transmits to Meta the fact that the user considered and evaluated a premium subscription to a mental health, religious, or self-improvement application, revealing the user's interest in and financial commitment to these deeply personal services.

76. When a user opens the App, the SDK transmits an "activated app" event to Meta that discloses the specific application being used (e.g., the I Am App, the Moodlight App, or the Bible Widget App), the time of day the user engaged with the App, and the duration of the user's session, collectively revealing patterns of engagement with sensitive personal content.

77. Likewise, when a user makes a purchase, the Facebook SDK transmits to Meta structured event data including the purchase amount, currency, and content category, disclosing both the user's financial behavior and the nature of the premium content the user sought to access.

78. The page view data captured by the Facebook SDK is particularly revealing because it exposes the specific screens, features, and content categories a user navigates within each App, including pages relating to particular affirmation

-22-

**CLASS ACTION COMPLAINT**

themes, mood states, meditation types, Bible reading plans, and vocabulary categories.

```
1  ∨ {
2      "include_headers": "false",
3      "advertiser_id_collection_enabled": "1",
4      "advertiser_id": "1CDA3BA1-EA76-4FB2-BF20-293FDDE2E5C9",
5      "application_tracking_enabled": "1",
6      "event": "CUSTOM_APP_EVENTS",
7      "ud": "{}",
8      "operational_parameters": "[{\"iap_parameters\":
       {\"is_autolog_app_events_enabled\":\"1\",
       \"is_implicit_purchase_logging_enabled\":\"1\"}},{\"iap_parameters\":
       {\"is_autolog_app_events_enabled\":\"1\",
       \"is_implicit_purchase_logging_enabled\":\"1\"}}]",
9      "sdk": "ios",
10     "custom_events": "[{\"fb_mobile_time_between_sessions\":\"session_quanta_1\",
       \"_eventName\":\"fb_mobile_deactivate_app\",
       \"fb_mobile_launch_source\":\"Unclassified\",\"_logTime\":1768869647,
       \"_session_id\":\"32CC89F9-E924-4221-9816-FB6943EE6584\",
       \"fb_mobile_app_interruptions\":3,
       \"_ui\":\"_TtGC7SwiftUI19UIHostingControllerV3IAM11OnbRootView_\",
       \"_valueToSum\":183},
       {\"_ui\":\"_TtGC7SwiftUI19UIHostingControllerV3IAM11OnbRootView_\",
       \"_eventName\":\"fb_mobile_activate_app\",\"_logTime\":1768869980,
       \"_session_id\":\"4F1DA472-419A-4251-B830-29CE6B868A57\",
       \"fb_mobile_launch_source\":\"Unclassified\"}]",
11     "format": "json",
12     "extinfo": "[\"i2\",\"com.MonkeyTaps.IAM\",\"20260109405\",\"6.18.0\",\"18.6.
       2\",\"iPhone17,3\",\"en_US\",\"CST\",\"--\",393,852,\"3.00\",6,-1,-1,
```

79. The Facebook SDK data also confirms that "advertiser_tracking_enabled" is set to "1," confirming that the data transmitted to Facebook is used for advertising and tracking purposes.

80. The Facebook SDK is also structured within the Apps to capture dozens of events including, but not limited to, purchases in the Apps ("is_implicit_purchase_logging_enabled" parameter set to "1"), when a user downloads the app, when a user opens the app, and how long a user spends on the app.

81. The implicit purchase logging feature is particularly invasive because it enables the SDK to capture purchase events automatically, without requiring the developer to implement any additional code for each transaction, meaning that every

-23-

CLASS ACTION COMPLAINT

in-app purchase a user makes—including subscriptions to premium affirmation content, advanced mood-tracking features, expanded Bible reading plans, or ad-free meditation experiences—is transmitted to Meta alongside the user's unique device identifiers.

82. The SDK further transmits session-level data including the total time a user spends within each App per session and the frequency of the user's return visits, which together reveal the depth and regularity of a user's engagement with personal mental health, spiritual, and self-improvement content.

83. Taken together, these data points enable Meta to construct a detailed behavioral profile of each user—one that reflects not only the user's general interest in personal growth applications but the specific emotional, spiritual, and psychological dimensions of the user's engagement, the intensity and frequency of that engagement, and the user's willingness to pay for premium access to these sensitive services.

84. Once received, Meta and TikTok do not merely store the intercepted data on Defendant's behalf or use it solely to provide services to Defendant. Rather, Meta and TikTok use the data intercepted from Defendant's Apps for their own independent commercial purposes.

85. Meta incorporates the intercepted data into its broader advertising ecosystem, combining it with data collected from across the millions of other applications and websites that have integrated the Facebook SDK and Pixel to build and refine comprehensive, cross-platform user profiles.

86. These profiles are then made available to third-party advertisers—entities entirely unrelated to Defendant—who use them to target users with personalized advertisements across Facebook, Instagram, and the Meta Audience Network.[39]

---

[39] Meta Platforms, Inc., *Privacy Policy*, "How do we use your information?,"

-24-

**CLASS ACTION COMPLAINT**

87. Similarly, TikTok incorporates the intercepted data into its own advertising platform, using it to power ad targeting, retargeting, and campaign optimization for third-party advertisers on TikTok's platform.[40]

88. In both cases, Meta and TikTok derive independent economic value from the intercepted data by monetizing it through advertising revenue that flows to Meta and TikTok, not to Defendant.

89. Users of Defendant's Apps never contemplated, consented to, or were informed that their private communications regarding their emotional states, religious beliefs, mental health practices, and personal vulnerabilities would be used by Meta and TikTok for these independent commercial purposes—purposes wholly unrelated to the personal growth and self-improvement services Defendant provides through the Apps.

90. Defendant's privacy policy does not disclose that users' data is transmitted to Facebook or TikTok for advertising and analytics purposes.[41]

---

https://www.facebook.com/privacy/policy/ (last visited Apr. 2, 2026) ("We'll use information that advertisers, businesses and other partners provide us about activity off Meta Company Products that we have associated with you to personalize ads that we show you on our Products, and on websites, apps and devices that use our advertising services. We receive this information whether or not you're logged in or have an account on our Products.").

[40] *TikTok Privacy Policy: Data Sharing Terms Requirements for Businesses*, https://usercentrics.com/guides/privacy-policies-of-major-platforms/tiktok-privacy-policy/ (last visited Apr. 2, 2026) (explaining that TikTok "may also aggregate your Event Data with information from other advertisers to enhance its own advertising system" and that "[t]he platform also applies this data to research and development, to help enhance its features and deliver a better experience for both users and advertisers").

[41] *Privacy Policy*, *supra*, n. 9.

-25-

**CLASS ACTION COMPLAINT**

91.    At no point during the download, installation, or use of the Apps is any user informed that their private communications and personal data will be intercepted and transmitted to these third-party advertising companies.

92.    To the contrary, as discussed above, Defendant represents to users that their information is kept confidential, secure, and will not be intercepted by third parties.

93.    Defendant did not obtain users' informed consent to the interception and transmission of their private communications and personal data to Meta or TikTok.

94.    The absence of disclosure in Defendant's privacy policy is particularly significant because users of the Apps—which are designed for personal growth, mental health, and self-improvement—have a heightened expectation of privacy regarding their in-app activities.

## REPRESENTATIVE PLAINTIFF'S EXPERIENCE

95.    Plaintiff Cameron Decker currently resides (and at all times relevant hereto has resided) in Encino, California.

96.    In or about mid-2025, while living and physically present in California, Plaintiff Decker downloaded and began using the I Am App, the Vocabulary App, and the Motivation App on his Apple iPhone.

97.    Over a period of approximately seven to eight months, Plaintiff Decker regularly used the Apps for personal growth and self-improvement.

98.    During his use of the I Am App, Plaintiff Decker interacted with and selected daily affirmations tailored to his personal goals and emotional well-being, and provided his religious beliefs, employment status, gender identity, and other sensitive information.

99.    During his use of the Vocabulary App, Plaintiff Decker interacted with vocabulary-building exercises and word selections reflecting his personal learning interests.

-26-

**CLASS ACTION COMPLAINT**

100. During his use of the Motivation App, Plaintiff Decker viewed and interacted with motivational quotes aligned with his personal values and aspirations.

101. During his use of the Apps, Plaintiff Decker made in-app purchases, providing behavioral and personal data generated through his use of the Apps.

102. Throughout Plaintiff Decker's use of the Apps, the Facebook iOS SDK and TikTok Business iOS SDK embedded within the Apps secretly intercepted his private communications and personal data—including his in-app interactions, page views, purchases, device identifiers (IDFA and IDFV), IP address, device information, and behavioral data—and transmitted this information to Meta and TikTok without his knowledge or consent.

103. At no point before, during, or after downloading or using the Apps did Plaintiff Decker consent to his in-app interactions, personal data, or device identifiers being intercepted and transmitted to Meta or TikTok as described herein.

104. Plaintiff Decker did not consent to have his data captured by the Facebook and TikTok SDKs present within the Apps or to have his private communications intercepted and transmitted to third-party advertising companies.

105. As discussed, Defendant's privacy policy did not notify Plaintiff Decker that his interactions with the Apps would be shared with Meta or TikTok through the embedded SDKs, and the privacy policy's misrepresentations concerning the confidentiality of users' communications, and omission of any reference to these third-party recipients, constituted an affirmative misrepresentation that such sharing would not occur.

106. Plaintiff Decker was unaware at the time that his information was being captured in real time by the Facebook and TikTok SDKs embedded within the Apps and disclosed to Meta and TikTok, which collect user data from across apps and the web to create personalized, identifiable advertising profiles combining the sensitive data generated within the Apps with users' broader digital activity.

-27-

**CLASS ACTION COMPLAINT**

107. Had Plaintiff Decker known that Defendant was using the Facebook and TikTok SDKs to capture his in-app interactions and personal data, and that Meta and TikTok collect user data from across apps and the web to create personalized, identifiable advertising profiles combining the sensitive data generated within the Apps with his broader digital activity, Plaintiff Decker would not have used the Apps, would have limited the information he provided and the extent of his engagement, or would have paid less for them.

108. As a direct and proximate result of Defendant's conduct, Plaintiff Decker's privacy rights were violated, and Plaintiff Decker suffered harm in the form of: receiving unwanted targeted advertisements related to his use of the Apps, including "spiritual" messages and personal growth content across his social media platforms that he had not searched for or otherwise engaged with outside of the Apps; loss of control over his private personal data and in-app communications; the unauthorized disclosure of his personal information to third-party advertising companies; loss of the benefit of the bargain in keeping or exchanging his private data; and other harms related to the undisclosed and non-consensual interception and transmission of his private communications and personal information.

## CLASS ACTION ALLEGATIONS

109. Plaintiff brings this action on behalf of himself and all others similarly situated pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3).

110. Plaintiff seeks to represent the following classes:

**Nationwide Class:**

All persons in the United States who downloaded and used one or more of the Apps on a mobile device during the applicable statutory period and whose data was intercepted and transmitted to Meta and/or TikTok by the SDKs embedded in the Apps.

**California Subclass:**

All persons in the State of California who downloaded and used one or more of the Apps on a mobile device during

-28-

the applicable statutory period and whose data was intercepted and transmitted to Meta and/or TikTok by the SDKs embedded in the Apps. [42]

111. **Numerosity:** The exact number of members of the Classes is unknown but, upon information and good faith belief, it is estimated to number in the hundreds of thousands, and individual joinder of these claims is therefore wholly impracticable. Members of the Classes can be readily identified through Defendant's records and objective criteria, and notice can be provided through techniques similar to those customarily used in other class action lawsuits.

112. **Typicality:** Plaintiff's claims are typical of the claims of other members of the Classes in that Plaintiff and the members of the Classes sustained damages arising out of Defendant's wrongful conduct, misrepresentations, false statements, concealment, and unlawful practices, and Plaintiff and members of the Classes sustained similar injuries and damages, as a result of Defendant's uniform illegal conduct.

113. **Adequacy:** Plaintiff will fairly and adequately represent and protect the interests of the Classes and has retained counsel competent and experienced in complex class actions to vigorously prosecute this action on behalf of the Classes. Plaintiff has no interests that conflict with or are antagonistic to those of the Classes, and Defendant has no defenses unique to Plaintiff.

114. **Commonality and Predominance:** There are many questions of law and fact common to the claims of Plaintiff and the Classes and those questions predominate over any questions that may affect individual members of the Classes. Common questions for the Classes include, but are not limited to the following:

---

[42] The Nationwide Class and the California Sub-Class are referred to collectively herein as the "Classes." Plaintiff reserves the right to revise or to amend these definitions based on the discovery of new information.

a. Whether Defendant violated the Electronic Communications Privacy Act, 18 U.S.C. §§ 2511, 2520;

b. Whether Defendant violated the California Invasion of Privacy Act, Cal. Penal Code § 631;

c. Whether Defendant's use of Tracking Technology is an unauthorized interception of electronic communications;

d. Whether Defendant unlawfully intercepted and manipulated user communications;

e. Whether Defendant was unjustly enriched by collecting and monetizing class members' private information;

f. Whether Defendant's practices violated privacy laws and regulations;

g. Whether Defendant breached a contract with Plaintiff and class members;

h. Whether Defendant was unjustly enriched by intercepting class members' communications;

i. Whether Defendant's representations on the Apps were deceptive; and

j. Whether Plaintiff and class members are entitled to damages and injunctive relief.

115. **Superiority:** There are substantial benefits to proceeding as a class action that render proceeding as a class action superior to any alternatives, including that class-wide adjudication will provide a realistic means for members of the Classes to receive monetary relief; the monetary relief suffered by members of the Classes may be relatively small; it would be substantially less burdensome on the courts and the parties than numerous individual proceedings; many members of the Classes may be unaware that they have equitable recourse for the conduct alleged herein; and because issues common to members of the Classes can be effectively managed in a single proceeding. Plaintiff and his counsel know of no difficulty that could be encountered in the management of this litigation that would preclude its maintenance as a class action.

116. Likewise, particular issues are appropriate for certification because such claims present only particular, common issues, the resolution of which would

**CLASS ACTION COMPLAINT**

advance the disposition of this matter and the parties' interests therein. Such particular issues include:

    a. Whether Defendant obtained proper consent before recording users' interactions with the Apps or recording users' information through the App;

    b. Whether Defendant's actions violated the Apps' users' reasonable expectations of privacy; and

    c. Whether Defendant's collection of personal information through Tracking Technology constitutes an invasion of privacy.

    d. Finally, all members of the proposed Classes are readily ascertainable as Defendant has access to Class and Subclass Members' names, emails and physical addresses.

## CAUSES OF ACTION

## COUNT I

**VIOLATION OF THE FLORIDA SECURITY OF COMMUNICATIONS ACT**
**Fla. Stat. §§ 934.03, 934.10**
***(On Behalf of Plaintiff & Nationwide Class)***

117. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

118. The Florida Wiretap Act, Fla. Stat. § 934.03(1)(a), prohibits any person from intentionally intercepting, endeavoring to intercept, or procuring any other person to intercept or endeavor to intercept any wire, oral, or electronic communication, holding that "[a]ny person who . . . intentionally intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept, any wire, oral, or electronic communication . . ." shall be subject to liability.

119. The Florida Wiretap Act defines "electronic communication" as "any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photooptical system." Fla. Stat. § 934.02(12).

-31-

120. Plaintiff's and Class members' interactions with the Apps, which include messages and communications that are received and interpreted by the App's servers, constitute "electronic communications" within the meaning of Fla. Stat. § 934.02(12).

121. Defendant intentionally embedded the Facebook and TikTok SDKs within the Apps, which intercepted Plaintiff's and Class members' electronic communications and transmitted the contents of those communications to Meta and TikTok without the knowledge or consent of Plaintiff or the Class members.

122. Defendant aided, abetted, and procured the interception of Plaintiff's and Class members' electronic communications by embedding the SDKs in the Apps and configuring them to transmit users' data to Meta and TikTok.

123. Neither Plaintiff nor any Class member consented to the interception and transmission of their electronic communications to Meta or TikTok. Defendant's privacy policy does not disclose these transmissions.

124. As a direct and proximate result of Defendant's violations of the Florida Wiretap Act, Plaintiff and the Class members have been injured and are entitled to statutory damages of the greater of $100 per day of violation or $1,000, whichever is greater, plus punitive damages, reasonable attorney's fees, and litigation costs pursuant to Fla. Stat. § 934.10(2).

## COUNT II

**VIOLATION OF THE ELECTRONIC COMMUNICATIONS PRIVACY ACT**
**18 U.S.C. §§ 2511, 2520**
*__(On Behalf of Plaintiff & the Nationwide Class)__*

125. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

126. The Electronic Communications Privacy Act ("ECPA"), 18 U.S.C. § 2511(1)(a), prohibits any person from intentionally intercepting, endeavoring to

-32-

**CLASS ACTION COMPLAINT**

intercept, or procuring any other person to intercept or endeavor to intercept any wire, oral, or electronic communication.

127. Plaintiff's and Class members' interactions with the Apps—including their in-app communications, data inputs, and behavioral interactions—constitute "electronic communications" within the meaning of 18 U.S.C. § 2510(12), as they are transfers of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photooptical system.

128. Defendant intentionally embedded the Facebook and TikTok SDKs within the Apps, which intercepted Plaintiff's and Class members' electronic communications and transmitted the contents of those communications to Meta and TikTok without the knowledge or consent of Plaintiff or the Class members.

129. While 18 U.S.C. § 2511(2)(d) provides an exception permitting a party to a communication to intercept that communication, this exception expressly does not apply where the communication is intercepted "for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State."

130. Defendant's interception of Plaintiff's and Class members' electronic communications was undertaken for the purpose of committing the tortious act of invasion of privacy (intrusion upon seclusion), as alleged herein. Specifically, Defendant secretly, and in contravention of its promises in its privacy policy, embedded the Facebook and TikTok SDKs within the Apps to intercept users' private communications and personal data—including their emotional states, religious beliefs, mental wellness activities, and other highly sensitive personal information—and to transmit that data to Meta and TikTok for advertising and profiling purposes, without users' knowledge or consent.

131. The crime-tort exception of 18 U.S.C. § 2511(2)(d) applies because Defendant's interception of Plaintiff's and Class members' communications was

-33-

**CLASS ACTION COMPLAINT**

conducted for the purpose of committing the tortious act of invasion of privacy, which constitutes an intentional intrusion upon the solitude or seclusion of Plaintiff and Class members in a manner that would be highly offensive to a reasonable person. Users of personal growth, mental wellness, and self-improvement applications have a heightened expectation that their activities within those applications—including their affirmations, mood entries, religious practices, vocabulary selections, and other deeply personal interactions—will remain private and not be secretly intercepted and transmitted to third-party advertising companies.

132. Defendant's conduct was willful and intentional, as Defendant deliberately implemented the Tracking Technologies knowing they would intercept users' electronic communications and transmit them to third parties without proper consent, and in contravention of its own Privacy Policy, which represented to users that their information would be kept confidential and would not be intercepted by third parties.

133. As a direct and proximate result of Defendant's violations of 18 U.S.C. § 2511, Plaintiff and the Class members have been injured and are entitled to relief pursuant to 18 U.S.C. § 2520, including: (a) statutory damages of the greater of $100 per day of violation or $10,000; (b) punitive damages in appropriate cases; (c) a reasonable attorney's fee and other litigation costs reasonably incurred; and (d) such preliminary and other equitable or declaratory relief as may be appropriate.

## COUNT III

### VIOLATION OF THE CALIFORNIA INVASION OF PRIVACY ACT
### Cal. Penal Code § 631
### *(On Behalf of Plaintiff & the California Subclass)*

134. Plaintiff repeats and re-alleges all factual allegations contained in the foregoing paragraphs as if fully set forth herein.

135. Plaintiff brings this claim individually and on behalf of the members of

-34-

the Class.

136. California Penal Code § 631(a) establishes liability for any person who:

[I]ntentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system,

Or

[W]illfully and without the consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line or cable or is being sent from or received at any place within this state,

Or

[U]ses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained,

Or

[A]ids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section.

137. At all relevant times, Plaintiff was accessing and using the Apps to seek personal growth and self-improvement services.

138. These Tracking Technologies constitute devices capable of intercepting communications within the meaning of California Penal Code § 631, as they are specifically designed to capture, record, and transmit user interactions and data inputs as they occur.

139. Defendant's assistance in the interception of Plaintiff's and California Subclass members' communications was accomplished without their consent. Specifically:

a. Defendant never obtained express consent from Plaintiff or California Subclass members before implementing Tracking Technologies;

b. The Apps require users to submit information through preliminary screening questions before they can create an account or review any privacy policies;

c. Tracking and interception begin immediately upon accessing the Apps, before any opportunity for users to provide informed consent;

-35-

d. Defendant never provided clear, conspicuous notice that users' electronic communications containing information would be intercepted and shared with third parties;

e. Any purported consent was ineffective because the interception began before consent could be obtained and because the disclosures were inadequate under applicable law.

140. The intercepted communications include highly sensitive information that Plaintiff and California Subclass members provided with reasonable expectations of privacy and confidentiality.

141. Defendant's conduct was willful and intentional, as Defendant deliberately implemented Tracking Technologies knowing they would intercept users' electronic communications without proper consent.

142. As a direct and proximate result of Defendant's violations of applicable state privacy laws, Plaintiff and California Subclass members have suffered injury, including invasion of privacy, loss of confidentiality of personal information, and violation of their statutory rights.

143. Plaintiff continues to desire to use the Apps' services but has a reasonable fear that electronic communications will continue to be intercepted without consent if using the Apps.

144. Under Cal. Penal Code § 637.2, Plaintiff and California Subclass members are entitled to:

a. Five thousand dollars ($5,000) per violation;

b. Three times the amount of actual damages sustained by the plaintiff; and

c. Equitable or declaratory relief.

145. Unless enjoined by this Court, Defendant will continue to intercept the communications of Plaintiff and California Subclass members and other App users without their consent, causing irreparable harm for which there is no adequate remedy at law.

-36-

**CLASS ACTION COMPLAINT**

# COUNT IV

## VIOLATION OF THE CALIFORNIA INVASION OF PRIVACY ACT
### Cal. Penal Code § 632
### *(On Behalf of Plaintiff & the California Subclass)*

146. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

147. Plaintiff brings this claim individually and on behalf of the members of the California Subclass against Defendant.

148. California Penal Code Section 632(a) provides that:

> [E]very person who, intentionally and without the consent of all parties to a confidential communication, uses an electronic amplifying or recording device to eavesdrop upon or record the confidential communication, whether the communication is carried on among the parties in the presence of one another or by means of a telegraph, telephone, or other device, except a radio, shall be punished[.]

149. California Penal Code Section 632(c) defines "confidential communication" as "any communication carried on in circumstances as may reasonably indicate that any party to the communication desires it to be confined to the parties thereto, but excludes a communication made in a public gathering or in any legislative, judicial, or other public proceeding in which the public is entitled to attend, or in any other circumstance in which the parties to the communication may reasonably expect that the communication may be overheard or recorded."

150. The communications between Plaintiff and class members and the Apps constitute "confidential communications" within the meaning of Section 632(c) because class members had an objectively reasonable expectation of privacy with respect to private communications and because Defendant created the false expectation that users' information is not shared with third parties.

151. Defendant intentionally used an electronic recording device—specifically, the Tracking Technology embedded within the Apps—to eavesdrop upon and record these confidential communications.

-37-

152. The Tracking Technology constitutes an "electronic amplifying or recording device" within the meaning of Section 632(a) because it is specifically designed to capture, record, and transmit user interactions and communications in real-time for analytics and behavioral tracking purposes.

153. Defendant intentionally implemented and activated this recording technology within its App with full knowledge that it would capture and record users' confidential communications.

154. Defendant's recording of Plaintiff's and California Subclass members' confidential communications was accomplished without the consent of all parties to the communication, specifically:

   a. Plaintiff and California Subclass members never consented to having their confidential communications recorded by the Tracking Technologies;

   b. Defendant never obtained express consent before implementing the recording technology;

   c. Users were not informed that their communications would be recorded and transmitted to the Tracking Technologies;

   d. No clear, conspicuous notice was provided regarding the scope and nature of the recording of confidential communications;

   e. The recording began immediately upon opening the App, before users had any opportunity to review privacy policies or provide informed consent.

155. Defendant's conduct was undertaken intentionally and with knowledge that the Tracking Technology would record confidential communications without proper consent from all parties.

156. The confidential communications that were unlawfully recorded include highly sensitive information.

157. As a direct and proximate result of Defendant's violations of Section 632, Plaintiff and California Subclass members have suffered harm including invasion of their privacy rights, violation of confidentiality, and loss of control over their sensitive information.

-38-

**CLASS ACTION COMPLAINT**

158. Unless enjoined and restrained by this Court, Defendant will continue to commit these violations. Plaintiff and California Subclass members have a reasonable fear that their confidential communications will continue to be unlawfully recorded if they use Defendant's App.

159. Pursuant to California Penal Code Section 637.2, Plaintiff and California Subclass members are entitled to:

    a. A preliminary and permanent injunction prohibiting Defendant from continuing their unlawful recording of confidential communications;

    b. Statutory damages of $5,000 per violation;

    c. Punitive damages for Defendant's willful and egregious violations of privacy; and

    d. Any other relief the Court deems proper.

Plaintiff and California Subclass members seek all available remedies under California Penal Code Section 632 and related provisions for Defendant's unlawful recording of confidential communications.

## COUNT V

### INTRUSION UPON SECLUSION
### *(On Behalf of Plaintiff & the Nationwide Class or Alternatively on behalf of the California Subclass)*

160. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

161. Under the Restatement (Second) of Torts § 652B, one who intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns, is subject to liability to the other for invasion of his privacy, if the intrusion would be highly offensive to a reasonable person.

162. Plaintiff and Class members had a reasonable expectation of privacy in their interactions with the Apps. The Apps are designed for deeply personal activities—recording emotional states, practicing affirmations tied to personal

-39-

insecurities and aspirations, tracking mood and psychological well-being, engaging in religious devotion and meditation, and pursuing self-improvement.

163.   Users reasonably expected that these intimate interactions would remain between themselves and Defendant and would not be secretly intercepted and transmitted to third-party advertising companies.

164.   Defendant's own Privacy Policy reinforced this reasonable expectation of privacy by representing to users that their information "cannot be intercepted," that "[a]ll user information will be treated with absolute confidentiality," and that Defendant would "only transfer your personal data to the companies strictly necessary to comply with the contracting of products and/or services."

165.   These affirmative representations created a reasonable expectation that users' private in-app communications would not be shared with entities such as Meta and TikTok for advertising purposes.

166.   Defendant intentionally intruded upon the solitude and seclusion of Plaintiff and Class members by secretly embedding the Facebook SDK and TikTok SDK within the Apps and configuring those SDKs to intercept users' private communications and personal data—including their emotional states, religious beliefs, gender identity, relationship status, employment status, mental wellness activities, personal affirmations, vocabulary learning patterns, mood entries, meditation practices, and daily habits—and to transmit that data, alongside persistent unique device identifiers, to Meta and TikTok in real time, without users' knowledge or consent.

167.   The intrusion was into a matter that Plaintiff and Class members had a right to keep private.

168.   The categories of information intercepted—mental health data, religious beliefs, gender identity, and emotional vulnerabilities—are among the most sensitive forms of personal information recognized by courts, legislatures, and regulatory bodies.

-40-

**CLASS ACTION COMPLAINT**

169. The California Consumer Privacy Act expressly designates religious beliefs and mental health information as "sensitive personal information."

170. The Federal Trade Commission has recognized that companies holding such data bear a heightened obligation to protect it and has taken enforcement action against companies that shared mental health app data with advertising platforms without meaningful user consent.

171. Defendant's intrusion would be highly offensive to a reasonable person. The following factors, considered together, establish the highly offensive nature of Defendant's conduct:

a. The sensitivity of the information intercepted. The data at issue concerns users' innermost emotional states, religious convictions, psychological vulnerabilities, and personal aspirations—information that, if disclosed, can subject individuals to stigma, discrimination, exploitation, and emotional distress.

b. The context of the intrusion. Users engaged with the Apps in the expectation that they were communicating privately with a personal growth and mental wellness platform, not broadcasting their most sensitive personal information to the world's largest advertising companies. The Apps invited users to be vulnerable, and Defendant exploited that vulnerability by secretly diverting those intimate communications to third parties.

c. The deceptive means of intrusion. Defendant did not merely fail to disclose the interception; it affirmatively represented to users that their information would be kept confidential and could not be intercepted. Users had no reasonable means of discovering the embedded SDKs or the data transmissions without conducting a technical analysis of the Apps' network traffic.

d. The scope and persistence of the intrusion. The SDKs intercepted user data continuously—from the moment a user first opened any of the Apps and throughout every subsequent session, thereby capturing a comprehensive record of each user's engagement with the Apps' most sensitive features.

e. The independent commercial exploitation of the intercepted data. Meta and TikTok did not merely receive and store the data on Defendant's behalf but incorporated the intercepted communications into their own advertising ecosystems, thereby creating detailed, cross-platform behavioral profiles of individual users, which were then made available to unrelated third-party advertisers for targeted advertising, retargeting, and campaign optimization.

-41-

**CLASS ACTION COMPLAINT**

172.    Defendant's intrusion was intentional. Defendant made a deliberate business decision to embed the Facebook and TikTok SDKs within the Apps, to configure those SDKs to capture users' private communications and personal data, and to enable the transmission of that data to Meta and TikTok for advertising and analytics purposes—all while representing to users that their data would remain confidential.

173.    As a direct and proximate result of Defendant's intrusion upon the seclusion of Plaintiff and Class members, Plaintiff and Class members have suffered damages, including but not limited to mental and emotional distress, loss of privacy, loss of control over their most sensitive personal information, the unauthorized construction of advertising profiles incorporating their private communications, and the receipt of targeted advertisements derived from their intercepted personal data.

## COUNT VI

### INVASION OF PRIVACY
### *(On Behalf of Plaintiff & the Nationwide Class or Alternatively on behalf of the California Subclass)*

174.    Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

175.    Plaintiff and Class members had a reasonable expectation of privacy in their personal communications and usage data within the Apps, which are designed for personal growth, self-improvement, and mental wellness.

176.    Defendant intentionally intruded upon the private affairs of Plaintiff and Class members by secretly embedding tracking SDKs in the Apps that intercepted and transmitted their private communications and personal data to Meta and TikTok without their knowledge or consent.

177.    Defendant's intrusion into the private affairs of Plaintiff and the Class would be highly offensive to a reasonable person. Users of personal growth and mental wellness applications have a heightened expectation that their activities

-42-

**CLASS ACTION COMPLAINT**

within those applications—including their affirmations, mood entries, vocabulary selections, and other personal interactions—will remain private.

178. As a direct and proximate result of Defendant's invasion of privacy, Plaintiff and the Class members have suffered damages, including but not limited to the loss of privacy and the unauthorized disclosure of their private information.

## COUNT VII

### BREACH OF CONTRACT
### *(On Behalf of Plaintiff & the Nationwide Class or Alternatively on behalf of the California Subclass)*

179. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

180. Plaintiff and Class members entered into contracts with Defendant when they downloaded and used the Apps, the terms of which are delineated in the Terms and Conditions and Privacy Policy.

181. As part of those contracts, Defendant agreed to handle users' personal data in accordance with its privacy policy and to refrain from disclosing users' data to undisclosed third parties for advertising purposes.

182. Defendant's Privacy Policy affirms that data is not transmitted to Facebook or TikTok for advertising and analytics purposes. Users reasonably relied on Defendant's privacy policy in deciding to download and use the Apps.

183. Defendant breached their contracts with Plaintiff and Class members by secretly transmitting their personal communications and data to Meta and TikTok through the embedded SDKs, in contravention of the reasonable expectations created by Defendant's privacy policy and the nature of the Apps.

184. As a direct and proximate result of Defendant's breach, Plaintiff and the Class members have suffered damages, including but not limited to the loss of the benefit of their bargain and the unauthorized disclosure of their private information.

-43-

CLASS ACTION COMPLAINT

## COUNT VIII

### BREACH OF IMPLIED CONTRACT
*(On Behalf of Plaintiff & the Nationwide Class or Alternatively on behalf of the California Subclass)*

185. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

186. Plaintiff brings this count in the alternative to Count VII.

187. Plaintiff and Class members entered into implied contracts with Defendant when they downloaded and used the Apps. As part of those implied contracts, Defendant agreed to handle users' personal data in accordance with its privacy policy and to refrain from disclosing users' data to undisclosed third parties for advertising purposes.

188. Defendant's privacy policy does not disclose that users' data is transmitted to Facebook or TikTok for advertising and analytics purposes. Users reasonably relied on Defendant's privacy policy in deciding to download and use the Apps.

189. Defendant breached the implied contracts with Plaintiff and Class members by secretly transmitting their personal communications and data to Meta and TikTok through the embedded SDKs, in contravention of the reasonable expectations created by Defendant's privacy policy and the nature of the Apps.

190. As a direct and proximate result of Defendant's breach, Plaintiff and the Class members have suffered damages, including but not limited to the loss of the benefit of their bargain and the unauthorized disclosure of their private information.

## COUNT IX

### UNJUST ENRICHMENT
*(On Behalf of Plaintiff & the Nationwide Class or Alternatively on behalf of the California Subclass)*

191. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

-44-

CLASS ACTION COMPLAINT

192.   Plaintiff pleads this claim in the alternative to Count VII and VIII.

193.   Defendant received a benefit from Plaintiff and Class members in the form of their valuable personal data, which Defendant secretly transmitted to Meta and TikTok in exchange for advertising revenue and other valuable consideration.

194.   Defendant's retention of the benefits conferred by Plaintiff and Class members, their personal data, is inequitable and unjust because Defendant obtained those benefits through the secret interception and transmission of users' private communications without their knowledge or consent.

195.   Plaintiff and Class members are entitled to disgorgement of the revenues and profits Defendant obtained as a result of its unjust enrichment.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff Cameron Decker, individually and on behalf of the Classes, respectfully requests that this Court enter judgment against Defendant Monkey Taps, LLC, and award the following relief:

A.   An order certifying the Classes as defined herein, appointing Plaintiff as Class Representative, and appointing Plaintiff's counsel as Class Counsel;

B.   Statutory damages under the Florida Wiretap Act, Fla. Stat. § 934.10(2), of the greater of $100 per day of violation or $1,000, whichever is greater, for each Class member, plus punitive damages;

C.   Statutory damages under CIPA, Cal. Penal Code § 637.2(a), of $5,000 per violation for each California Subclass member;

D.   Statutory damages under the ECPA, 18 U.S.C. § 2520(c)(2), of the greater of $100 per day of violation or $10,000, whichever is greater, for each Class member, plus punitive damages;

E.   Compensatory and consequential damages in an amount to be determined at trial;

-45-

**CLASS ACTION COMPLAINT**

F. Disgorgement of Defendant's ill-gotten revenues and profits;

G. Injunctive relief requiring Defendant to cease the unauthorized interception and transmission of users' data to Meta, TikTok, and other undisclosed third parties;

H. Pre-judgment and post-judgment interest as allowed by law;

I. Reasonable attorney's fees and litigation costs pursuant to 18 U.S.C. § 2520(b)(3), Fla. Stat. § 934.10(2)(c), and Cal. Penal Code § 637.2;

J. Such other and further relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff, on behalf of himself and the Classes, hereby demands a trial by jury on all issues so triable.

Dated: April 16, 2026

Respectfully submitted,

*/s/ Victor J. Sandoval*
Victor J. Sandoval (SBN 344461)
**ALMEIDA LAW GROUP LLC**
3415 S. Sepulveda Blvd Suite 1121
Los Angeles, California 90034
(562) 534-5907
victor@almeidalawgroup.com

*Attorney for Plaintiff & the Putative Classes*

-46-

CLASS ACTION COMPLAINT